OK, when you're ready. Thank you. Good morning. May it please the Court, my name's Ed Sato. I represent the appellant IPC USA, Inc. I'd like to, if successful at it, reserve five minutes for rebuttal. Watch the clock, it counts down. I'll try to help. Thank you. Your Honors, the heart of this appeal is a fundamental error in assuming, this is made by the courts below, that IPC's claims to cash and receivables are only those of a simple unsecured creditor. This fundamentally misses IPC's interest as the owner of the underlying fuel, and therefore the owner of the resulting receivables. In this case, the cash that's at issue was in the possession of Petit Oil, the debtor or consignee, only through a mistake. The customers erroneously sent their remittances to the wrong address despite instructions to send it directly to IPC's lockbox. They seem to have made that mistake a lot. Yes, I think probably because they had a history of dealing with Petit Oil, is my speculation. If they were repeat customers, that would explain it. But for some reason, nobody seems to sort of say, don't do this again. I mean, this seems to be their standard practice. I mean, we're talking millions of dollars that we're all. The actual time frame over which this happened before we got to the bankruptcy petition was only a month or two, I think. OK. The accounts receivable, which is by far the largest amount at issue here, belong to IPC. It's clear in the contract that they were the proceeds of. But that's true for any consigned goods, right? Yes. In a true consignment, yes. And I would distinguish between a true consignment that's intended to be a security interest. Because the courts, if they find that it's intended to be a security interest, can conclude that the property actually belongs to the consignee. Right. But if it's going to be consigned goods, in order to protect the security interest, you've got to perfect it. Well, you have to perfect your interest in goods. And I would. So the mere fact of ownership doesn't answer the question. It certainly does not answer the question with respect to consigned goods. With respect to goods, that's correct, because. But the question is whether or not the accounts receivable and the cash will be treated comparably to goods. And Your Honor, our position on that, and this is based on the provisions in Article 9, is particularly 9-319, the way by which a competing person gets an interest in those goods that belong to IPC is by having either bought the goods and therefore being entitled to protections in 9-319, which says that the consignee can, in fact, sell those goods, or by having a competing lien interest in the goods. But 9-319 makes it clear that competing lien interest must be attaching at the time when the consignee still has possession of the goods. And that's explicit language from 9-319. From that, and the basis for that is that there's a concern that goods that are being sold by a merchant that deals in that type of goods could be confused. It's hard to tell whether it's the consignor's property or it's that merchant's property. And that's why the focus on goods, and that's why the focus on possession, because the way 9-319 works is that at such time as the goods are no longer in the possession of the consignee, the consignor gets left alone. If it was a bailment under state law, the consignor remains entitled to all the rights it would have under a common law bailment. That includes all the proceeds. And if we don't construe 9-319 that way, what you're doing is writing out of the statute the requirement that these competing liens arise at a time when the debtor still, or the consignee still has possession of the goods. All the other provisions in the UCC relating to priorities, whether there's perfection, the rights and proceeds, they flow from 9-319, which creates a legal fiction that the consignee has the right to give someone else an interest in the goods. But 9-319 doesn't say the consignee can give the consignor's accounts receivable, or cash, to a third party. And that would be required. It would be a strange concept, because 9-319 recognizes, as does the definition of consignment, that a true consignment is a bailment. So that would be a strange concept,  of the underlying property, and therefore the proceeds remains with the bailor or the consignor. And it's in the record, as I'm sure the court knows, but not only is this what would be expected under the law, but it was what was implemented into practice. The actual invoices to the customer, the end users of the fuel, the end purchasers, directed payment to IPC, not to the debtor. And that's perfectly consistent with a consignment agreement and with the law of bailment. So here, the trustee's rights depend on section 9-319. And to hold otherwise is to make every single true consignment, which is a bailment, into a secured transaction. But that's completely contrary to the scheme of the Uniform Commercial Code, which treats security interests as securing a right to payment, or the performance of an obligation. That's the definition of a security interest in section 1-201 of the code. But on the other hand, we have a true consignment, and that's defined in 9-102, 8-20, I believe. And the last subsection of that section says, in a true consignment, it is not a transaction that secures a performance obligation. You know, I can imagine that the security system would work differently from the way it's set up. I get all of that. And it does seem to me different in the sense of the impact on the real world, in the sense of what the other creditors have in mind as they lend and so on, to try and figure out other secret liens with their sector property. I get all of that. On the other hand, as I read the ICC, excuse me, the UCC, it seems to be treating the cash proceeds identically to goods. I'm looking, for example, at 9-324B, which says, quote, a perfected PMSI in inventory has priority over conflicting security interests in the same inventory. Got it. And here it comes. Also has priority in identifiable cash proceeds. Sounds as though the UCC is not distinguishing between the inventory and the cash proceeds. Well, Your Honor, that is true once we have a competing interest to deal with. In other words, if I do. Well, we do. Well, we don't when the goods are gone. That's our argument. At the point in time when the trustee becomes a hypothetical lien creditor on the bank account. But when the goods are gone is when you're going to have the proceeds. Precisely. But this language talks about, then, priority in identifiable cash proceeds.  about the situation in which the goods are gone and all you have is the proceeds. Your Honor, if a competing lien has attached to the goods, then we concede that lien follows into the proceeds. And by the same token, if IPC perfects its purchase money security interest in the goods, it has a right to follow that into identifiable proceeds as well. But failing to do that, then what happens? Well, then you have IPC owning its receivables. And how does a creditor get a right in receivables when consigned goods are gone? It's not very much of a stretch to say that creditor concedes all of IPC's receivables, even if they have nothing to do with these goods. The whole mechanism by which a competing creditor gets rights is 9319. And if we don't acknowledge that, we're writing it out of the entire code. And the error below was that the court treated it as if this were a sale. And therefore, all of the rights associated with these goods, including the rights to the proceeds of the goods, transferred to Pettit Oil. And Pettit Oil was then in a position to grant liens. I can use another example. Let's say that we're dealing with a lending relationship. It's pretty clear that if a lender makes an umbrella loan with all the security it can ask for, all the goods, the receivables, the intangibles, all the proceeds, and it's perfected, and then along comes a consignor and it doesn't file its UCC. The lender doesn't have any knowledge of the consignor's interest. The lender wins. It wins on everything. But let's take, let's reverse the order of things. IPC has an interest that it has not filed a financing statement for. Then along comes a lender. Can the consignee, which is Pettit Oil, give that lender all of IPC's receivables? That doesn't make any sense. There's nothing by which to say that lender has a right to rely on someone else's receivables. And there's been no misrepresentation about the receivables here. Because in this case, the lender, the actual lender, he knew all about the consignment agreement. So if the consignee doesn't have the right to just, in a vacuum, pledge the receivables of IPC's property, that's the answer. It depends on having a possessory right in goods, which then follows into all the proceeds of those goods. And we concede that point. We concede that by saying that the trustee gets the value of the goods, even if the money wasn't collected. That would incorporate all the proceeds of the goods that were in existence on the petition date. OK. Now you're at five minutes. I'd like to reserve my remaining five minutes, if I may. Thank you very much. May it please the court, Andrew Morton, on behalf of the appellee, Catherine Ellis, the trustee. Your Honors, this appeal is about how Article 9 applies to give the trustee in bankruptcy superior rights in the property that is the subject of this dispute. 9109A expressly provides that Article 9 applies to a consignment, as the term consignment is defined in Article 9. It defines secured property, which is the right of the party to include a consigner. It defines security interest in Article 1, which Mr. Sato quoted, but incompletely. Security interest also includes, quote, any interest of a consigner in a transaction that is subject to Article 9. As a result, all of Article 9's provisions governing perfection and priority in goods and in proceeds of goods also apply equally to all of a consignor's interests. As security interests that arise out of a consignment. Here, IPC concedes, as they just did again in argument, that as provided by Article 9, the subject transaction here is a consignment, as defined by Article 9, and so is governed by Article 9, and that IPC failed to file a financing statement to perfect its interests arising thereunder, also as required by Article 9. So here, Article 9 applies. It provides that IPC was a secured party whose rights and collateral constituted unperfected security interests subject to subordination and avoidance by the trustee exercising her rights and powers as a hypothetical judicial lien creditor under Section 544A1 of the Bankruptcy Code. That was the result reached by the Bankruptcy Court and by the BAP unanimously affirming, because it is compelled as a matter of law by the plain text of Article 9, and we therefore ask this court to affirm. That's, in a nutshell, the statutory argument that we've made. It's in our briefs, and the relevant sections are described in there, and I'd be happy to talk about them. Rather than focus more on that, I'd like to turn back to a couple of the points that Mr. Sato made in the opening argument, and a question that you posed, Judge Fletcher, about, well,  and of other creditors as a matter of law? Is essentially the purchase money security interest in goods, and the proceeds of those goods, isn't that all one and the same under Section 9324? And the answer is yes, it is. And this is discussed in the BAP opinion below. This distinction that IPC has attempted to draw between a consignment for security, as opposed to a true consignment subject to Article 9, based simply on the fact that their consignment doesn't purport to create a security interest, and so is somehow treated differently, is meaningless. By definition, a true consignment that is subject to Article 9 doesn't purport to create a security interest. That's the point. That's why it's in the definitions that way. Because if it did purport to create a security interest, we wouldn't have to do that. It would just be governed by Article 9, because then you have a security interest. So nevertheless, IPC contends that it somehow creates this purchase money security interest, but only for limited purposes. And that's also directly contrary to the text of the statute. 9103 encapsulates the whole idea and flat out says a consigner, under a consignment transaction, the security interest that it holds is a purchase money security interest in inventory. And that's the way that the UCC and Article 9 reaches the result that I think you were getting out about preventing secret liens, which is that it simply transforms the consigner under a consignment that fits within the definitions of Article 9 into really no different from any other purchase money security lender with an interest in inventory, but for one exception, which isn't relevant in this appeal. And that has to do with the remedies as against the debtor. Those aren't an issue here. And the code simply recognizes in an exit point. And that's what 9319 does, is 9319 is the provision of the code that gets the consigner out from under Article 9, but only in the circumstance where the consigner is seeking to repossess its goods. And all it does then is it says, after the consigner has established that it has a superior interest to all other creditors under Article 9, and only then in goods, then at that point, if it wants to exercise its remedies against the debtor, it doesn't need to use the remedies that are described in Part 6 of Article 9. It can exercise its contractual remedies. But none of that's relevant here. 9319 doesn't do what IPC says in terms of bifurcating the world into this universe where Article 9 applies for part of a consignment transaction just as to goods. But then somehow, when the goods are converted to proceeds, Article 9 suddenly doesn't apply anymore, even though Article 9 sets forth a great deal of provisions, including Section 9.324, that describe exactly what happens to security interests, including purchase money security interests in inventory, when goods are sold and turned into proceeds. The off-ramp out of Article 9 is at the remedy point. It isn't at the point of how we describe proceeds. And that's what leads, I think, to this difficult and frankly irreconcilable conflict in IPC's own position. And it was described again here today at argument, which is, well, the proceeds, which are accounts receivable that are generated by the sale of consigned goods, IPC argues, those proceeds, the nature of our right as a consigner in them is one and the same as the interest we would have in goods. And I should add, by the way, that they cite no authority for this proposition. And in fact, it's contradicted by the comments to the prior version of Article 9. This is also discussed in the BAP opinion, in the comments to old section 9114, explained that it was generally understood that consignors don't have a continuing interest in their proceeds. And in fact, are generally satisfied with that, because what their main concern is is about inventory. So they take this position that, well, somehow we nevertheless have essentially the interest of a consigner in goods. We also have the same type of interest in receivables, as though we had consigned those too, even though they haven't. And once the goods are sold, we get that right back. And because we get that right back, and there's nothing to deem that the debtor has those rights, nobody else can take an interest, because the debtor owns nothing. Well, that is difficult to square with IPC's concession that, in fact, other creditors can get a security interest and take ahead of IPC in the receivables, but only if they have a continuing interest in proceeds. So they say there are, in fact, two types of Article IX secured creditors, one which they say can take an interest in receivables proceeds from the sale of goods. And that would be a creditor that had a pre-existing security interest in the goods, and then it continues under 9315 in proceeds. But they say, oh, but the debtor actually doesn't have sufficient rights to grant security interests. So no security interest can attach. And they point to the situation with the trustee here in the hypothetical offered earlier about the difference between a floor lender and how somehow that floor lender can get rights ahead of IPC, not just in goods, but in proceeds of goods, as long as it had a pre-existing interest in inventory. But then somehow the same lender that brings in the same security interest can't get that same interest. And this seems to be premised on the idea that, well, the debtor can't grant it, because now the debtor has already entered into this arrangement with the consignor, so it doesn't have the right to grant it. But that isn't the issue. The issue isn't whether the debtor is granting the security interest or not. The question is whether a security interest can attach at all. And either it can or it can't, whether it arises out of a grant under a security agreement or by operation of law as a lien creditor or as a continuing interest in proceeds. And so this problem, I think, is irreconcilable. And we've tried to illustrate that with a similar hypothetical that we attached as an appendix to our brief, where we gave an example of some of the problems that this creates. And in their reply, IPC tries to address that hypothetical, which involved three creditors, a secured party one, which takes an interest only in receivables as original collateral,  in inventory, and then a consigner of inventory. And IPC's position is, well, there's no evil work here as between the consigner, the unperfected consigner, and the factor that seeks to take an original interest in receivables, even if they come prior. Because, well, the debtor should know that it can't pledge those receivables to the factor. But what they kind of ignore completely is, but what happens if there's this other creditor in here that also takes an interest, but a different interest? In inventory. And IPC has conceded that, well, if that creditor perfected and the consigner didn't, then they take ahead of IPC, not just in the inventory, but in receivables proceeds. The problem, though, is what about the factor that happens to be perfected prior to that inventory financer? So IPC's position is, well, we lose to the second perfected secured party in proceeds and in inventory. But in the absence of a consigner, that second perfected secured party would lose to the first perfected secured party. And this is the circularity problem that is created by IPC's position. So it isn't just a matter of IPC sort of turning the coat on its head and asking Section 931A to do a great deal more work, not only than it does, than what it needs to do. But that's kind of evidenced in the result that we see. All that's happened is they've said, well, the drafters of the Uniform Commercial Code solved the problem of secret liens that are held by consignors in inventory. And that's great. And then somehow washed their hands of it. And having eliminated that problem, created a new one, which is the secret lien of consignors in proceeds. And this is just completely contrary to the entire purpose for which the code was drafted. It's entirely contrary to how consignments are treated. And maybe most importantly of all, it's contrary to all the language that's found in Article 9. Article 9, as I said at the beginning, defines the consigner into all of these roles. Defines a consigner as a secured party. That way, when we see the term secured party throughout Article 9, we don't have to draw a distinction between secured parties and consignors. All consignors are secured parties. Not all secured parties are consignors. And the reason is because there is one exception, whereby a consigner can exercise its remedies. But again, this isn't about remedies as against the debtor. This is merely about perfection and relative priority as against other creditors. And the code draws no distinction between when a security interest attaches, in terms of whether it can attach at all. Either it can attach or it can't. And at that point, we then just go to the priority rules that are found in Section 9.322. And those very clearly say that a perfected security interest in property takes ahead of an unperfected security interest. And having done that, we turn to 9.317. And 9.317 says that a security interest that is lower in priority under 9.322 can be subordinated. And from there, we turn to 544 of the Bankruptcy Code. It grants the trustee as a lien creditor the same rights and powers as a judicial lien creditor. This is straightforward application of the priority and perfection rules of Article 9. And this attempt to kind of turn the code upside down and create an exit from it where there is none really kind of subverts the whole thing. I think, unless there are any questions about that, I'll briefly summarize. In short, we wouldn't be here if IPC had just filed a financing statement. Of course. That's the point of this whole thing. And that's really the problem. That's why the bankruptcy court below denied a constructive trust when they sought that, is the bankruptcy court said, look, you had an adequate remedy at law. And you didn't avail yourself of it. And we don't give people constructive trusts and turn the Bankruptcy Code priority system upside down just for the benefit of sophisticated parties who draft consignment agreements, as IPC did in this case, and then fail to perfect their interests. So IPC's attempt to escape the consequences of its own negligence have to be rejected. It offers this parochial interpretation for which it cites no case authority. It's very difficult, I find, to square with the text of the code. And frankly, it leads to results that are incoherent, unfair, and, as I said, atextual. The BAP explained this in a short comment toward the end of its opinion. It simply pointed out that to accept IPC's argument about Article 9319A, the court would have to believe that the drafters of the Uniform Commercial Code silently negated all of the other provisions that they just set forth that bring the consigner in through these definitions, apply the perfection rules, apply the priority rules, and apply the rules governing continuing interest in proceeds, it's difficult to conceive that 9319 should be interpreted to just completely upend this entire system. In contrast, the decisions below from the bankruptcy court are consistent with the purpose of the law, they're consistent with the principles of notice and fairness that are embodied by the Uniform Commercial Code, and they're consistent with the plain text of the law. And for all those reasons and the others discussed in our briefs and the decisions below, we respectfully request that this court to affirm judgment in favor of the trustee. Okay, thank you. Thank you. Mr. Sato, you saved some time. Thank you. Briefly and again, IPC does concede that it did not file a financing statement. Therefore, it loses on the goods that were in the possession of the consignee, and all the proceeds of the goods. But again, to reiterate a point, there is no authority in the Uniform Commercial Code for consignee to grant a separate security interest in IPC's receivables that's independent of possession of the goods. There's just simply no authority. And the comment to the actual definition of consignment, which is where we start in Article 9, it's comment 14 to Section 9-102, makes it clear that security interests and true consignments are not the same thing. It says that a consignment, there's three types of consignments. One is a consignment that's excluded from the UCC because it involves small transactions or involves consumer goods or that type of thing. The second is a consignment that's intended for security. And the comment says these consignments are not bailments, but secured transactions. Accordingly, all of Article or Division 9 applies to them. So that is, that's where, if this were a secured transaction, if IPC had sold the fuel to Petit Oil and Petit Oil was the owner, of course it could grant a security interest in the accounts receivable that result from the sale. But that's not what we have here. What we have is a true consignment in which the court made a finding that this was not a transaction to secure a performance obligation or payment obligation. It was not a sale. It was a bailment. And the third part, the third type, is a true consignment that meets the definition of Section 102.820. That's what we have here. It's what the court found we have here. It's a bailment that's not intended as security to secure an obligation. So we have to look at Section 9-319 because it's a bailment in which IPC owns all the property unless there's a provision that says, no, there's some special rights that creditors can have. And that section is 9-319. And as I said, it has to do with possession of goods that can be confusing to a lender or a lien creditor who comes on the scene and says, how about these goods? Can I have security in those? And if it's hard to tell if they're consignor's goods, that's what this section addresses. It doesn't address what are the rights to payment for goods that have been consigned to you. Those rights belong to the consignor. And although it's not precisely on point, I would refer the court to the Valley Media case from the Delaware Bankruptcy Court citing our materials. It makes it clear that by not filing a financing statement, the consignor does not lose its ownership of the fuel. Well, if it doesn't lose its ownership of the consigned goods, the fuel here, how does it lose its right to the receivables? Well, I think the point of the BAP was that you didn't lose your ownership, but you did lose priority. You can have competing rights on a pot of money, obviously. And the question for the bankruptcy court is to determine the priority. So you got out of line. You were entitled to be first in line. Didn't perfect it, and so you ended up second. Well, but yes, let me address money very briefly. To use maybe an imperfect analogy, if I go to a hotel and I accidentally leave my wallet there and it has some cash in it, but the hotel's in possession of it and then the hotel files bankruptcy, but it's clear this cash is mine because it's in my wallet. And does the trustee or a lien creditor get to take the wallet and the cash? I think that's an absurd result. Yes, that's right, but it's not the same question. Well, with respect to proceeds, if I have an IOU from somebody that says IOU, Mr. Sato, X dollars, and it's left at the hotel and the hotel files bankruptcy, do does the trustee get to ignore the fact that the IOU says that's on its face? I owe Mr. Sato these dollars? Well, it depends a little bit, the circumstances under which you left the hotel. Did you leave the hotel as a consignor? Or did you just leave it there? Fair enough, but again, I back up to if 9319 has any meaning, it has to define at what point these competing rights attach. They don't attach when the goods are out of possession of the consignee. If they did, we'd be able to go back and look at all the transactions that happened before this creditor ever came on the scene. Could be millions of dollars. Why don't those belong to the trustee? It's because that's a completed transaction. There was no competing creditor on the scene. It was a bailment. IPC gets to keep its cash and receivables that are generated until the time when the competing creditor comes on the scene and gets rights and goods and all the proceeds thereafter. OK. That uses your time. Thank both sides for their very helpful arguments. Thank you very much. IPC versus Ellis now submitted for decision, and that completes our arguments for this morning. Thank you.
judges: W. Fletcher, Bybee, Burns